CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

AUG 2 6 2005

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

PATRICIA STEPHENS,

<em>Plaintiff,</em>

v.

COUNTY OF ALBEMARLE,

CITY OF CHARLOTTESVILLE,

RIVANNA SOLID WASTE AUTHORITY,

<em>Defendants.</em>

CIVIL ACTION No. 3:04CV00081

<u>MEMORANDUM OPINION</u>

JUDGE NORMAN K. MOON

Before this Court are three motions filed by the Defendants the County of Albemarle, the City of Charlottesville, and the Rivanna Solid Waste Authority ("RSWA") (collectively, the "Defendants"): (1) a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1); (2) a motion to dismiss for lack of standing under Fed. R. Civ. P. 12(b)(1); and (3) a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). This matter was referred to United States Magistrate Judge B. Waugh Crigler for proposed findings of fact, conclusions of law, and a recommended disposition. *See* 28 U.S.C. § 636(b)(1)(B). In his April 14, 2005 Report and Recommendation, the Magistrate Judge recommended that this Court deny the motion to dismiss for lack of subject matter jurisdiction but grant the motions to dismiss for lack of standing and failure to state a claim. The Plaintiff, Patricia Stephens, filed timely objections to the Magistrate Judge's recommendation of dismissal on the grounds of lack of

standing and failure to state a claim.

Having reviewed the entire case and all relevant law, the Court shall accept in part and reject in part the Magistrate Judge's Report and Recommendation. The Court shall deny the Defendants' motion to dismiss for lack of subject matter jurisdiction, grant in part and deny in part the Defendants' motion to dismiss for lack of standing, and grant in part the Defendants' motion to dismiss for failure to state a claim upon which relief can be granted.

## I. Facts

On October 15, 2004, the Plaintiff filed a complaint under 42 U.S.C. § 1983 on behalf of her decedent husband and herself, seeking damages for alleged violations of both her and her husband's constitutional rights secured by the First and Fourteenth Amendments of the United States Constitution. The origins of her claim go back to 1998, when various neighbors of the Ivy Landfill, which is operated by the Defendants, sued the Defendants for environmental violations at the landfill. *Weber v. Rivanna Solid Waste Authority*, 3:98CV00109 (W.D.Va. 1998). After a number of the citizen-plaintiffs (the "Settling Plaintiffs") reached a compromise and settlement (the "Settlement Agreement") with the Defendants, the court, under presiding United States District Judge James H. Michael, approved their Settlement Agreement and dismissed the case.[1] In return for the Defendants' agreement to certain waste disposal, monitoring, and remediation measures, the Settling Plaintiffs agreed to refrain from engaging in certain forms of opposition to the Defendants with respect to the landfill. This included an agreement on the part of the plaintiffs to not oppose the issuance of a permit to the RSWA for a certain type of waste disposal cell. The Settlement Agreement defines "opposing" to include activities such as presenting oral

---

[1] The claims of four other citizen-plaintiffs were voluntarily dismissed, subject to Tolling Agreement(s) giving these plaintiffs the right to reinstitute proceedings withing a specified period of time. Such time has passed and no further actions have been instituted.

comments at any public hearing in opposition to the permit, making statements to the press in opposition to the permit, and providing documents to the relevant authorities for the express purpose of opposing the permit. Settlement Agreement at 31, *Weber*, No. 3:98CV00109 (docket no. 64). The Settlement Agreement also required the plaintiffs to remove a website that they had created in opposition to the landfill as well as any language or images on any other personal websites or billboards dealing with matters raised in the litigation. Settlement Agreement at 33.

The Plaintiff alleges that the provisions to which the Settling Plaintiffs agreed directly led to her husband's death in an explosion at the landfill, where he worked as an employee of the RSWA. On April 10, 2003, the decedent died as a result of an explosion that occurred when he was cutting up old oil storage tanks at the landfill, a practice which the Plaintiff alleges is a "serious" OSHA violation. The Plaintiff claims that, if not for these provisions of the Settlement Agreement requiring the Settling Plaintiffs to cease their opposition to the Defendants, this practice would have been exposed as an OSHA violation and these practices would have been terminated or the decedent would have refused to engage in them before the date of the accident that resulted in his death.

The Plaintiff's complaint includes three counts. In Count I ("Violation of First Amendment proximately causing death"), the Plaintiff claims that the Defendants violated the decedent's First Amendment right to receive speech and proximately caused his death when they "purchased silence or otherwise gagged those knowledgeable about safety problems" at the landfill. (Pl.'s Compl. ¶20) Count II ("Due Process violation") claims that the Settlement Agreement violated the decedent's right to substantive due process under the Fourteenth Amendment because the deliberate acts of the Defendants, all governmental entities, were arbitrary, unreasonable, and not justified by any legitimate governmental interest. Count III

involves purely constitutional claims, asserting that the Defendants violated the First Amendment rights of the Plaintiff and her decedent husband to receive speech concerning the landfill from the Settling Plaintiffs. Thus, the Plaintiff brings Counts I and II in her representative capacity, and Count III in her individual and representative capacity.

The Defendants filed a motion to dismiss for lack of subject matter jurisdiction as to Counts I and III and motions to dismiss for lack of standing and failure to state a claim for which relief can be granted as to all three counts.

## II. Standard of Review

In deciding any motion to dismiss under Fed. R. Civ. P. 12(b), a court must construe the plaintiff's pleadings liberally, taking all facts alleged in the complaint as true and resolving all doubts and drawing all reasonable inference in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999); Charles Alan Wright and Arthur Miller, Federal Practice and Procedure § 1363 at 463 (West Supp. 2004). However, a court is not required to accept any legal conclusions offered by the plaintiff in the complaint. *United Mine Workers of America, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085 (4th Cir. 1979). On a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, the burden of proving subject matter jurisdiction lies with the plaintiff. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Evans v. B.F. Perkins Co., a Div. Of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). A motion to dismiss for failure to state a claim under Rule 12(b)(6) must not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746 (1976) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## III. Judicial Notice

The Defendants have filed three motions to dismiss. Rule 12(b) provides that where "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(b). However, the court is entitled to "take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (quoting Fed. R. Evid. 201(b)). Moreover, the court may do so without converting the motion to dismiss into a motion for summary judgment. *See, e.g., Papasan v. Allain*, 478 U.S. 265, 268, n.1 (1986) (stating that the Court was not precluded, in considering a motion to dismiss, from taking notice of items on the public record); *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995). Judicial notice is often taken with respect to court records, *GE Capital Corp.*, 128 F.3d. at 1081, and is appropriate where the records pertain to a prior case that is either brought into the pleadings or is related to the instant case. *U.S. Fidelity & Guaranty Co. v. Lawrenson*, 334 F.2d 464, 467 (1964) (citing *Lowe v. McDonald*, 221 F.2d 228, 230-31 (9th Cir. 1955)). The court need not accept as true allegations that are contradicted by facts that can be judicially noticed. *See* Wright and Miller § 1363, n.38 and §1364 n.36 (citing cases); *Iacoponi v. New Amsterdam Cas. Co.*, 379 F.2d 311 (3rd Cir. 1967), *cert. denied* 389 U.S. 1054 (1968).

The Plaintiff objects to the manner in which the Magistrate Judge took judicial notice of the court records in the *Weber* case. (Pl.'s Obj.'s to R&R, Obj.'s 2, 8, and 16.) In Objections 2 and 16, the Plaintiff contends that the Court should address only the allegations pled in her complaint and should not consider the specifics as to the Settlement Agreement in *Weber*.

5

However, as explained above, the Court is entitled to take judicial notice of other court records on a motion to dismiss. It is, furthermore, prudent to do so when the Plaintiff's own pleadings implicate the terms of the Settlement Agreement in *Weber* as the basis for her complaint. The Plaintiff also objects that the Report's recitation of facts relating to prior settlements is incomplete. (Pl.'s Obj.'s to R&R, Obj. 8.) She claims that it is her "understanding" that there was more than one lawsuit involving the Defendants and that safe drinking water, not money, was the chief consideration received by the Settling Plaintiffs. Again, the Magistrate acted properly in noticing the terms of the Settlement Agreement in *Weber*, especially in light of the fact that the Plaintiff acknowledges in her objections that it is the *Weber* settlement that is at issue in this case. (*See* Pl.'s Obj.'s to R&R at 9.) If the Plaintiff believes that the Magistrate should have taken other records into account she should have identified them rather than resting on her "understanding" of them. The Court, therefore, overrules the Plaintiff's objections as to judicial notice of the record in *Weber* and will take notice of these records for the purposes of deciding the motions currently before it.

**IV. Motion to Dismiss for Lack of Subject Matter Jurisdiction**

In their Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Defendants argue that the Plaintiff's claims are barred by the Virginia Worker's Compensation Act's exclusivity provision, Va. Code Ann. § 65.2-307 (2004). This provision provides that an employee's death benefit claim and award paid under the terms of the Act "shall exclude all other rights and remedy of such employee, his personal representative, ... at common law or otherwise, on account of such ... death." *Id.* The Defendants argue that the decedent's death was fully covered by the Virginia Worker's Compensation Act, thereby excluding all other rights and remedies arising from the accident, because the Plaintiff is currently receiving benefits under the

6

Act on account of her husband's death while employed by the RSWA. The Magistrate Judge recommends that this motion be denied because the receipt of workers' compensation death benefits does not bar the recipient from recovering for violations of her constitutional rights under 42 U.S.C. § 1983. As no objection has been filed to this portion of the Magistrate's Report, the Court reviews the matter for clear error.

The Supremacy Clause of the United States Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary." U.S. Const. Art. VI, Sec. 2. This Court is, therefore, presented with the question of whether § 1983 preempts the exclusivity provision of the Virginia Worker's Compensation Act due to the Supremacy Clause. The Court finds that it does.

The key to determining whether a federal law preempts state law under the Supremacy Clause is ascertaining the intent of Congress in creating the federal statute. *California Federal Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272 (1987); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983); *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). A determination of Congressional intent may proceed along a number of lines:

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.

*California Federal Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987) (internal citations

7

omitted). Finally, federal legislation may preempt state law where "Congress' command is implicitly contained in its structure and purpose." *Adams Fruit Co., Inc. v. Barret*, 494 U.S. 638, 643 (1990). Because Section 1983 predates the creation of state workers' compensation laws, this third basis of preemption guides the Court's analysis.

Section 1983 provides in full:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1983. Two functions are, therefore, performed by § 1983. First, it seeks to protect citizens from the infringement by state authorities of their rights, privileges, and immunities as secured by the United States Constitution and federal law. *Monroe v. Pape*, 365 U.S. 167 (1961). Second, it serves to provide a federal remedy against the violating party as a means of vindicating these protected rights. *Gomez v. Toledo*, 446 U.S. 635, 639 (1980) (quoting *Owen v. City of Independence*, 445 U.S. 622, 651 (1980)). Passed against the backdrop of widespread civil rights abuse in the Reconstruction South, § 1983 was not intended to serve merely as a remedy of last resort in situations where state law provided no adequate remedy. *Monroe*, 365 U.S. at 183. Instead, Congress intended § 1983 to provide a remedy in federal courts *supplementary* to any remedy any state might have. *Damico v. California*, 389 U.S. 416, 417 (1967) (quoting *McNeese v. Bd. of Education*, 373 U.S. 668, 672 (1963)).

Because Congress enacted § 1983 as an independent federal remedy for state infringement of rights secured by the Constitution or federal law, a right of action under this

8

section is not barred by an exclusivity provision in a state workers compensation law. Allowing a state to extinguish a § 1983 cause of action through an exclusivity provision in its own remedial scheme, no matter how adequate it may be, would frustrate Congress' intent to create a federal remedy independent of and supplementary to any available state remedy. Upholding Congress' intent to create a broad federal remedy for the protection of constitutional rights requires that § 1983 preempt the exclusivity provision in the Virginia Worker's Compensation Act.

Accordingly, the Court accepts the Magistrate's recommendation as to this matter and denies the Defendants' motion to dismiss for lack of subject matter jurisdiction.

## V. Motion to dismiss for lack of standing

The doctrine of standing contains three essential requirements: (1) the plaintiff must have suffered an invasion of a legally protected interest; (2) there must be a causal link between the injury and the conduct complained of such that the injury is fairly traceable to the actions of the defendant; and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As the party invoking federal jurisdiction, the Plaintiff bears the burden of establishing these elements. *Id.* at 561. However, because this case is at the pleading stage, general factual allegations of injury resulting from the Defendants' conduct will suffice because the general allegations are presumed to embrace those specific facts necessary to support the claim. *Id.*

The Defendants move the Court to dismiss all three counts on the grounds that the Plaintiff fails to meet the three-part test articulated in *Lujan*. Specifically, the Defendants argue that the Plaintiff has not articulated an injury to a legally protected interest or a non-attenuated causal link between the Settlement Agreement and the decedent's death.

9

## A. First Amendment claims: Counts I and III

The Defendants contend that the Plaintiff lacks standing as to Counts I and III because she fails to articulate a violation of her or her husband's First Amendment rights to free speech. The Defendants argue that the disputed provisions of the Settlement Agreement only implicate the First Amendment rights of the Settling Plaintiffs, who agreed to cease certain forms of opposition to the landfill in return for the Defendants' concessions and payments of money, and not those of the instant Plaintiff or her decedent, who were not parties to that Agreement or in any way involved in the litigation against the Defendants. They go on to assert that neither the Plaintiff nor her decedent had a right to receive information about the landfill from the Settling Plaintiffs because they were not willing speakers, as evidenced by their agreement to the terms of the settlement. This motion, therefore, asserts that the Plaintiff has no standing to raise these First Amendment claims because she does not articulate any legally protected right to receive speech concerning the landfill from the Settling Plaintiffs.

The Plaintiff contends that her complaint does allege an invasion of First Amendment rights to free speech belonging to her and her husband, thereby satisfying the injury element of the *Lujan* test for standing. The Plaintiff's claim that the Defendants violated her and her husband's First Amendment rights is grounded on two arguments. First, that as members of the public who stood to be affected by the landfill's operations, she and her husband had a First Amendment right to receive speech concerning the landfill's operations from the Settling Plaintiffs, who had willingly spoken out against the landfill prior to the settlement. Second, that the Defendants violated this right to receive speech by unconstitutionally inducing the Settling Plaintiffs to give up their right to oppose the landfill in exchange for safe drinking water.

It is well settled that the First Amendment provides a constitutional right to receive

Case 3:04-cv-00081-NKM-JGW   Document 27   Filed 08/26/05   Page 10 of 27   Pageid#: 157

speech. Protection of the right to receive information and ideas is a necessary component of ensuring freedom of speech. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). However, one important limitation on this right to receive speech is that it is contingent upon the existence of a willing speaker. *Virginia State Bd. of Pharmacy v. Virginia Consumer Council*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker."). Where a willing speaker exists, "the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both." *Id.* Thus, the existence of a willing speaker is critical to establishing standing to assert a First Amendment right to receive speech. In *Virginia State Board of Pharmacy*, the plaintiffs, a prescription drug user and two nonprofit organizations, challenged the constitutionality of a Virginia statute which rendered it unethical for a pharmacist to advertise prescription drug prices. *Id.* at 753-54. The willingness of at least some pharmacists to advertise having been stipulated, the Court found that the plaintiffs had standing to assert a right to receive information concerning drug prices from pharmacists. *Id.*; *see also, Lamont v. Postmaster General*, 381 U.S. 301 (1965) (upholding the First Amendment rights of citizens to receive political publications sent from abroad); and *Procunier v. Martinez*, 416 U.S. 396, 408-409 (1974) (holding that censorship of prison inmates' outgoing mail infringed the rights of those noninmates to whom the mail was addressed). Conversely, a plaintiff does not have standing to assert a right to receive speech where he cannot show that there exists a speaker willing to convey information to him. *See, e.g., FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838-839 (3rd Cir. 1996) ("Third parties have standing to challenge a gag order only when there is reason to believe that the individual subject to the gag order is willing to speak and is being restrained from doing so.").

Whether the instant Plaintiff and her decedent had a legally cognizable right to receive

11

information from the Settling Plaintiffs concerning conditions at the landfill, therefore, depends on the willingness of the latter to provide that information. The Plaintiff argues that the Settling Plaintiffs were willing to speak out until they were "gagged" by the Settlement Agreement. (Pl.'s Obj.'s to R&R at 6.) Certainly, they were free to speak out and did speak out – without any alleged government interference – until their case was settled. But it is not enough for Mrs. Stephens to state that but for the Settlement Agreement, there would have been willing speakers. (Pl.'s Obj.'s to R&R at 6.) She must show that, even after the settlement, there were willing speakers who were improperly prevented from speaking by the Defendants.

The Plaintiff could proceed under one of two theories in order to establish the existence of a willing speaker: (1) the Settling Plaintiffs were willing speakers because they were actually coerced – in the usual sense of the word – into silence, in which case the government is impermissibly restricting communication between willing speakers and listeners, as in *Virginia State Board of Pharmacy*; or (2) the Settling Plaintiffs were willing speakers because any such silence provision in a settlement agreement involving the government is an unconstitutional condition on a government benefit. The Plaintiff's complaint does not pursue the first theory. Although she occasionally uses words such as "gagged" and "coerced" throughout her pleadings and objections, she does not actually allege that the *Weber* plaintiffs were coerced into settling, at least not in the normal sense of that word. Furthermore, at the motions hearing on February 15, 2005, the Plaintiff's attorney signaled that she was pursuing the second theory – that any such agreement between a government and a private party would be unconstitutional, even if voluntary on both sides. According to the Plaintiff, any deal with the government involving the relinquishment of First Amendment rights in exchange for safe drinking water is inherently coercive and outside the permissible scope of governmental action. The contention, therefore, is

12

that the Settling Plaintiffs remained willing speakers, despite having agreed to the settlement, because the Defendants could not constitutionally include in the settlement provisions requiring them to not speak out against practices at the landfill in exchange for concessions on the part of the Defendants. (Pl.'s Obj.'s to R&R at 6, 11-12.)

It bears mentioning that the Plaintiff has argued that the question of whether the Settling Plaintiffs remained willing speakers after the settlement is a question of fact that should be resolved in her favor since this case is at the motion to dismiss stage. (Pl.'s Obj.'s to R&R at 6, 11-12.) Although on a motion to dismiss the court must accept as true those facts pled by the plaintiff, it does not have to accept as true or correct any legal conclusions offered by the plaintiff. *United Mine Workers of America, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085 (4th Cir. 1979). Plaintiff's assertion that the Settling Plaintiffs remained willing speakers after the settlement necessarily rests on the legal conclusion that they were unconstitutionally silenced by the Settlement Agreement. After all, they could not be said to be willing speakers if they the agreed to the settlement free of any unconstitutional government interference or inducement. Because the existence of a willing speaker hinges on a question of law - the constitutionality of the Settlement Agreement - the Court does not presume the existence of a willing speaker, but must instead determine whether the settlement is constitutional as a matter of law.

Although the Plaintiff does not specifically mention it by name, her approach to establishing a willing speaker rests on the unconstitutional conditions doctrine. The Supreme Court has held that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, ... [it] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This doctrine serves to prevent the government from

13

doing indirectly what it cannot do directly - that is, to prevent the government from using its discretion to disperse benefits as a means of inducing citizens to give up their rights to engage in constitutionally protected activities. *Id.* However, not every instance in which the government conditions the receipt of a benefit on the surrendering of a constitutional right violates this doctrine, as courts will balance the right surrendered against the government's interest in efficiently providing benefits and services. *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 676 (1996).

Courts have applied the unconstitutional conditions doctrine with special vigor where the government conditions the receipt of a benefit on the forfeiture of one's First Amendment rights to free speech. Included in this context are cases which involve the government acting in a wide variety of roles, ranging from proprietor, *see, e.g.*, *Lovell v. Griffin*, 303 U.S. 44 (1938); *Cantwell v. Connecticut*, 310 U.S. 296 (1940); educator, *see, e.g.*, *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503 (1969); and employer, *see, e.g.*, *Pickering v. Board of Education*, 391 U.S. 563 (1968); to provider of tax breaks, *see, e.g.*, *Speiser v. Randall*, 357 U.S. 513 (1958). The theory behind the Plaintiff's case, which is that the unconstitutional conditions doctrine applies where the government acts as a counter-party to a court-approved settlement agreement, breaks new ground and presents a matter of first impression to this Court. This Court's research has uncovered only one case - in the Eastern District of California - where the unconstitutional conditions doctrine was applied in the context of a settlement.[2] Although no Fourth Circuit precedent exists regarding the application of this doctrine to settlement agreements, *Lake James*

---

[2]The Eastern District of California addressed this question in *Louisiana Pac. Corp. v. Beazer Materials & Servs.*, 842 F. Supp. 1243 (E.D. Cal. 1994), finding that the unconstitutional conditions doctrine applied to a settlement between the EPA and the operator of a sawmill which required the sawmill operator to waive various due process rights.

*Community Volunteer Fire Dep't v. Burke County*, 149 F.3d 277 (4th Cir. 1998), provides

authority insofar as settlement agreements are viewed as being contractual in nature.[3]

In *Lake James*, a volunteer fire department contracted with a county to provide fire

services for a particular district. *Id.* at 279. However, due to problems that the fire department

had previously experienced in providing its services to the county, the county required the fire

department to waive its statutory right to veto any petitions that citizens might raise seeking to

transfer into other fire districts. *Id.* The county also insisted that the fire department waive its

right to challenge this particular provision in court. *Id.* The fire department agreed to these

waiver provisions, but subsequently challenged the no-challenge provision as an unconstitutional

condition on a government benefit. *Id.* On hearing the fire department's claim, the district court

applied the unconstitutional conditions doctrine and balanced the importance of the right given

up against the county's interest in securing the condition. *Lake James Community Volunteer Fire*

*Dep't v. County of Burke*, 1997 U.S. Dist. LEXIS 7613, at *13 (W.D.N.C. May 13, 1997), rev'd

149 F.3d 277 (1998). The court concluded that the no-challenge provision was void as an

unconstitutional condition because it unreasonably infringed upon the fire department's First

Amendment right to petition the government for a redress of grievances and did not further the

county's interest in providing efficient fire services. *Id.* at *9-10.

On appeal, however, the Fourth Circuit applied a different mode of analysis and reversed.

*Lake James*, 149 F.3d at 281-82. The court began by framing the issue as that of a contractual

waiver of a constitutional right rather than an unconstitutional condition, noting that the

unconstitutional conditions doctrine does not preclude parties from negotiating contracts that

---

[3]The parties to the *Weber* Settlement Agreement state that its terms are contractual in
nature. *See Gertrude Weber v. Rivanna Solid Waste Authority*, 3:98CV00109, Docket # 66 at 37,
Settlement Agreement, October 24, 2000.

waive certain constitutional rights. *Id.* at 280, 282. After acknowledging that contractual waivers of constitutional rights may well be subject to heightened scrutiny, the court held that such waivers are enforceable when they are knowing, voluntary, and not contrary to the relevant public interest. *Id.* at 280. The court applied this rule to the contract and found the waiver to be enforceable and not void on constitutional grounds. *Id.* at 281. The court made special note of the fact that the fire department signed the contract with the advice of counsel and that the no-challenge provision was narrowly tailored so as to only give effect to the agreement to not veto the citizens' transfer petitions. *Id.*

While *Lake James* did not involve a settlement agreement as the instant case does, settlements are essentially contracts and should be subject to the same analysis. *See, e.g., Southerland v. Estate of Southerland*, 249 Va. 584 (1995) (property settlement agreements are contracts and subject to the same rules of interpretation). As noted *supra* note 3, the parties to the Settlement Agreement acknowledged as much. The waiver analysis in *Lake James,* therefore, controls as to whether the Defendants unconstitutionally "silenced" the Settling Plaintiffs by including the waiver provisions in the Settlement Agreement, despite the fact that the Plaintiff has essentially pled her case around the unconstitutional conditions doctrine. Thus, the Plaintiff must allege that the waiver of First Amendment rights in the settlement was either not a knowing or voluntary waiver, or that it violates public policy.

Assuming all facts alleged in the complaint as true and resolving all doubts and drawing all reasonable inferences in the Plaintiff's favor, her complaint does not allege an unconstitutional waiver under a *Lake James* analysis. As to the requirement that a waiver be made knowingly, the Plaintiff's complaint, even when construed liberally, contains no allegation that the Settling Plaintiffs made an unknowing waiver of their First Amendment right to

16

challenge and speak out against the practices at the landfill. Nor can the Court reasonably infer an unknowing waiver from the facts alleged. The section titled "Settlement Contingencies" states that the Settling Plaintiffs agree and understand that the settlement is contingent upon their agreement to refrain from certain forms of opposition set forth in plain terms. Settlement Agreement at 30-31. Furthermore, the Settling Plaintiffs state that they were represented by counsel throughout the negotiations leading up to the Settlement Agreement. Thus, the Court does not assume for the purpose of this motion that the waiver was agreed to unknowingly.

With respect to whether the waiver was voluntary, the Plaintiff makes no allegation of fact that the Defendants acted to coerce - at least not in the normal sense of the word - the Settling Plaintiffs into agreeing to not speak out against the landfill. The Plaintiff instead indicated at oral argument that her theory is that settlements in which the receipt of a government benefit is conditioned on the relinquishment of First Amendment rights are coercive as a matter of law. Thus, the closest the Plaintiff comes to alleging that the waiver was involuntary is her argument that citizen-litigants such as the Settling Plaintiffs may not have sufficient bargaining power to resist waiving their rights in exchange for benefits such as safe drinking water. (Pl.'s Objs to R&R at 7.) This contention that the settlement was coerced as a matter of law rests on the premise that the Settling Plaintiffs could only have agreed to the settlement because they feared that they might not be able to secure a more favorable result through further litigation. This, however, is a feature of all settlements in that they reflect a calculation by litigants that a compromise is in their best interest and that the uncertainties of future litigation may work out to their disadvantage. Indeed, the court records in *Weber* reflect that the Settling Plaintiffs agreed to the settlement precisely for this reason, even though they could have pursued a more one-sided outcome through further litigation. For instance, the parties state in the "RECITALS" that they

17

had found settlement to be "in their mutual interest" in that it would "resolve conclusively all claims" and avoid the uncertainties and expenses of litigation. Settlement Agreement and Release at 3. Moreover, the Court takes judicial notice of the fact that no formal objections were raised stating that the Settling Plaintiffs felt that the terms of the settlement were coercive. Because the record in *Weber* indicates arms-length negotiation and no objections of coercion by the parties and because the instant Plaintiff makes no allegation that the Defendants used coercive tactics to obtain settlement, the Court cannot reasonably infer that the waiver of the right to oppose certain practices of the landfill was involuntary. The fact that this Settlement Agreement, negotiated at arms-length and approved by the presiding United States District Judge, involved the contractual waiver of First Amendment rights in exchange for concessions on the part of the Defendants does not preclude it from being voluntary.

Ultimately, the Plaintiff's challenge to the Settlement Agreement goes to the question of whether it undermines the public interest, the third element established in *Lake James*. This is underscored by the fact that at various points in her pleadings, the Plaintiff seems to abandon the notion that the Settlement Agreement was coercive in nature, choosing instead to characterize the Defendants as having "bribed" the Settling Plaintiffs or having "[bought]" their silence. (Pl.'s Obj.'s to R&R at 4.) Whether or not the Defendants can "purchase" such a waiver from plaintiffs willing to be "bought out" with the promises of changed practices at a landfill and better drinking water implicates the issue of public policy rather than the issue of voluntariness.

The question of whether the settlement violates public policy is a question of law which is properly decided by the court on a motion to dismiss. *See, e.g.*, *Livingstone v. North Belle Vernon Borough*, 91 F.3d 515 (3rd Cir. 1996) (question of whether release-dismissal agreement is in the public interest is a question of law for the court to decide); *St. Paul Fire & Marine Ins.*

*Co. v. FDIC*, 968 F.2d 695 (8th Cir. 1992) (whether a contractual provision violates public policy is a question of law); *American Casualty Co. v. FDIC*, 39 F.3d 633, 638 (6th Cir. 1994); and *United Mine Workers of America, Inc.*, 609 F.2d at 1085 (questions of law at motion to dismiss to be decided by court). The Plaintiff alleges that the Settlement Agreement undermined the public interest by achieving silence on environmental and safety violations at the landfill - two matters of public interest. She also maintains that the settlement was contrary to public policy in that it only silenced a particular political point of view. For the purposes of evaluating the public policy implications of the waiver provisions, it is worth noting the similarities between the waiver provisions at issue in this case and those approved of on public policy grounds in *Lake James*. The waivers in both cases were tailored to the facts of the dispute and were designed to prevent the parties from indirectly undermining the terms of the settlement. In *Lake James*, for example, the court characterized the no-challenge provision as a means of "giving effect to [the fire department's] promise to consent to the citizens' [transfer] petitions." *Lake James*, 149 F.3d at 281. Without the safeguard of the no-challenge agreement, the fire department could have undone its promise to not veto transfer petitions by challenging this waiver in court and having it struck down. In other words, the no-challenge provision was designed to uphold the integrity of the agreement and prevent the fire department from restoring its right to veto the petitions without losing the benefit of the contract with the county.

The same is true of the waiver provisions in the *Weber* settlement. This Settlement Agreement was designed to put an end to litigation and "resolve conclusively all claims and disputes" between the Defendants and the Settling Plaintiffs. Settlement Agreement at 4. Without a commitment from the Settling Plaintiffs to not publicly oppose certain practices of the Defendants, the Defendants would not have had any reasonable assurance of peace because the

Case 3:04-cv-00081-NKM-JGW   Document 27   Filed 08/26/05   Page 19 of 27   Pageid#: 166

plaintiffs would have been able to resume their opposition in other public arenas despite having settled their claims in court and secured valuable concessions. In short, the waiver provisions prevented the Settling Plaintiffs from having their cake and eating it too. Although limiting the Settling Plaintiffs' ability to oppose the landfill, the waiver provisions undoubtedly worked to their benefit in the end by giving the Defendants the assurance of finality needed before they could sensibly commit themselves to change their practices at the landfill. Thus, instead of being a shrewd or opportunistic move by the Defendants to buy political acquiescence, as the Plaintiff would have the Court believe, the waiver provisions are more reasonably understood as a means of upholding the integrity of the entire settlement. By making possible the prospect of settlement, the waiver provisions also helped the parties avoid expensive and protracted litigation. Furthermore, they did so under terms that satisfied not only the parties and attorneys on both sides, but also the presiding United States District Judge.

It should also be noted that the waiver provisions did not seek any sort of universal silence with respect to environmental and safety issues at the landfill. The settlement was only binding on the litigants who agreed to its terms, leaving other members of the public, and even the other litigants who were not parties to the settlement, free to voice their concerns about any practices at the landfill. Nor was the settlement secret and shielded from the public eye, as it was filed along with the Order of Dismissal and became part of the public record in this case, which remains open for inspection by the public. Indeed, the Plaintiff's own complaint purports to quote the settlement language. The waiver provisions, therefore, did not banish the information which Plaintiff contends would have led to changes in how oil storage tanks were cut up at the landfill. Rather, the terms were tailored to the specific facts of the case and served to facilitate the express desire of these particular parties to conclusively resolve all disputes between them.

20

The Court, therefore, finds that as a matter of law the Settlement Agreement did not undermine the public interest.

The Plaintiff's pleadings, in short, are legally insufficient to show that the Defendants effected an improper waiver of First Amendment rights on the part of the Settling Plaintiffs. Her pleadings do not allege that they waived their First Amendment rights unknowingly. Nor do they allege any facts which would allow a court to draw a reasonable inference that the Defendants coerced them into waiving their constitutional rights. Finally, this Court finds that as a matter of law the settlement was not contrary to the public interest. Because the Court finds that the Plaintiff has failed to allege any fact from which it can be concluded that the waiver provisions improperly silenced the Settling Plaintiffs, it must conclude, as a matter of law, that the Settling Plaintiffs were not willing speakers. Having failed to properly allege the existence of a willing speaker, the Plaintiff lacks standing to assert an invasion of her right to receive speech from the Settling Plaintiffs. Thus, the Court concludes that the Plaintiff does not have standing either in her own capacity (Count III) or as administratrix of the decedent's estate (Count I).

Accordingly, the Court will grant the Defendants' motion to dismiss for lack of standing as to Counts I and III.

*B. Causation: Counts I, II, and III*

In their motion to dismiss for lack of standing, the Defendants also argue that the Plaintiff lacks standing for failing to allege sufficient facts tracing her husband's death back to the Settlement Agreement. Any causal link between the two, they contend, rests on a series of inferences insufficient to withstand a motion to dismiss. *See Lujan*, 504 U.S. at 560 (a plaintiff must show that an "injury fairly can be traced to the challenged action" in order to have standing). The Plaintiff contends that pleading the link between the settlement and her husband's

21

death is sufficient to survive a motion to dismiss and that discovery should be allowed in order to prove this chain of causation.

In his Report, the Magistrate Judge recommends that the Defendant's motion to dismiss for lack of standing be granted on the grounds that the Plaintiff does not allege sufficient facts linking the settlement with the decedent's death. The Report finds that the Plaintiff's claims relating to her husband's death are purely speculative because the original complaint against the landfill only addressed environmental and safety matters pertaining to the litigants' property, while alleging nothing in relation to the workplace conditions that resulted in the decedent's death. The assumption that either the instant Plaintiff or her decedent would have learned about the Settling Plaintiffs' complaints as well as the workplace conditions at the landfill prior to the accident and that the decedent would have refused to perform the unsafe tasks that resulted in his death are, in the opinion of the Magistrate, so speculative as to not satisfy the causal prong of the *Lujan* standing test. The Court, however, rejects the Magistrate's recommendation as to this issue.

Under the test articulated in *Lujan*, standing requires that there must be a causal connection between the injury and the conduct complained of such that the injury is "fairly traceable" to the conduct. *Lujan*, 504 U.S. at 560. The plaintiff's burden of showing causation at the pleadings stage is reduced and "general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* at 561. Furthermore, the fact that the injury complained of may have resulted indirectly does not in itself preclude standing. *Warth v. Seldin*, 422 U.S. 490, 504 (1975). This is true even where the allegation is that a governmental restriction imposed on one person leads to an indirect infliction of harm upon a third party. *Id.* at 505. It may, however, be more difficult to meet the minimum requirement of causation in such a scenario. *Id.* Where a

22

chain of causation is particularly indirect or attenuated, a court may find the allegation sufficient as a matter of pleading if the plaintiff alleges that she has been injured and these allegations are capable of proof at trial. *See, e.g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 (1973).

The causal link alleged by the Plaintiff is admittedly indirect and relies on a number of speculative inferences regarding what might have happened had the Settlement Agreement not included the waiver provisions. The chain of causation, for example, relies on the assumption that the neighbors would have continued their campaign against the Defendants; that these complaints would have made information concerning the dangerous practice of cutting up old oil storage tanks known to either OSHA or the decedent; and that either OSHA would have forced the landfill to fix these violations or the decedent would have refused to perform the dangerous tasks. While this line of causation may be difficult to prove at trial or on summary judgment, it is premature to hold that the Plaintiff's allegations are overly attenuated when no discovery has been conducted on the matter. Furthermore, because this matter is addressed at the motion to dismiss stage, the Court must resolve all doubts and draw all reasonable inferences in the Plaintiff's favor as to the allegations about each causal link. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). Construed in this manner, the complaint alleges causation sufficient to survive a motion to dismiss, even if withstanding a subsequent motion for summary judgment would be unlikely. Therefore, the Court finds that the Plaintiff has alleged facts sufficient to meet the causation requirements of standing with respect to Counts I and II.

With respect to Count III, a claim based purely on the violation of the First Amendment rights of the Plaintiff and her husband, the Court need not address the causal link between the

Case 3:04-cv-00081-NKM-JGW   Document 27   Filed 08/26/05   Page 23 of 27   Pageid#: 170

Settlement Agreement and any First Amendment violations. As discussed *supra*, the Court finds that the Plaintiff has not alleged a violation of her or her husband's First Amendment rights.

Accordingly, the Court will deny the Defendants' motion to dismiss Counts I and II for lack of standing on the grounds of inadequate allegations of causation.

## VI. Motion to dismiss for failure to state a claim

Because the Court finds that the Plaintiff lacks standing as to the counts based on violations of the First Amendment, the Court will only address the Defendant's motion to dismiss for failure to state a claim as to the Plaintiff's substantive due process claim.

In Count II of her Complaint, the Plaintiff argues that the Defendants deprived her decedent of his right to substantive due process by securing the silence of the Settling Plaintiffs and proximately causing his death. The Plaintiff relies on *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), for the proposition that the Due Process Clause of the Fourteenth Amendment protects citizens against arbitrary and conscience-shocking actions of the government. In *County of Sacramento*, the Supreme Court noted that the "touchstone of due process is the protection of the individual against arbitrary action of government, whether the fault lies in the denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento*, 523 U.S. at 845-46. When dealing with abusive executive action, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). Such behavior must shock the conscience to be cognizable. *Id.* This stringent standard distinguishes the due process clause from torts based in negligence because "our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying

24

down rules of conduct to regulate liability for injuries that attend living together in society." *Id.* at

848 (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1986). Thus, a claim based on the

violation of one's right to substantive due process must allege "state action so arbitrary and

irrational, so unjustified by any circumstance or governmental interest" that vindication of one's

rights requires action under § 1983. *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 440

(4th Cir. 2002) (quoting *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991)).

       In order to claim that the waiver provisions of the Settlement Agreement deprived the

decedent of his right to substantive due process, the Plaintiff must allege facts which, construed

in her favor, show that entering into the Settlement Agreement with its particular waiver

provisions was unreasonable and unsupported by any legitimate governmental interest. *Tri-*

*County Paving, Inc.*, 281 F.3d at 440. The Plaintiff argues that the Defendants' behavior was

conscience-shocking because they deliberately entered into a settlement which they knew

violated the First Amendment and were indifferent as to the consequences that could follow. It is

this purposeful behavior that she claims makes the Defendants' behavior a violation of her

husband's constitutional rights rather than a tort based in negligence. Furthermore, she claims

throughout her complaint that the waiver provisions in the Settlement Agreement could not have

furthered any legitimate state interest. The Defendants counter that this claim is the type of

garden variety tort action that is specifically prohibited from being raised under the guise of the

Fourteenth Amendment.

       Determining whether the Plaintiff could possibly show that the Defendants' actions were

so arbitrary and unjustifiable as to shock the conscience requires the Court to examine the

Defendants' governmental interests in entering into the Settlement Agreement. As explained

*supra*, it is eminently reasonable for a governmental subdivision to agree to a settlement with

citizen-litigants that satisfies all parties, including the presiding judge, and conclusively ends all disputes between them. Had the Settlement Agreement not contained the waiver provisions in question, the Settling Plaintiffs would have been free to continue their opposition to the Defendants in public and before relevant regulatory agencies. Such behavior would have vitiated the parties' express goal of reaching a conclusive resolution of all disputes. The waiver provisions, tailored to the particular facts of the underlying dispute, foreclosed this possibility and facilitated a settlement avoiding costly and protracted litigation. The Plaintiff's contention that the Defendants had no governmental interest in entering into this settlement is without merit.

Nor can the Plaintiff argue that the Defendants acted with any sort of deliberate indifference as to the consequences that this settlement could have for the decedent while he worked at the landfill. It must be noted that the litigation in *Weber* concerned environmental practices at the landfill and their effects on the property of the neighboring plaintiffs, not workplace safety violations occurring at the landfill. The settlement reflects this orientation as its terms deal with changes designed to lessen the landfill's impact on the neighbors' land in return for the Settling Plaintiffs' promise to remove material from their websites related to the litigation and to not oppose the RWSA's attempts to obtain certain permits. Settlement Agreement at 31, 33. Given the settlement's focus on the specific environmental practices underlying the litigation, the Court does not see how the Defendants could have entered into settlement with deliberate indifference as to how the settlement and its waiver provisions might compromise the safety of workers engaged in the unsafe practice of cutting up old oil storage tanks. The Court, therefore, concludes that as a matter of law the Defendants did not act in a manner so arbitrary or unjustifiable as to implicate the Fourteenth Amendment when they entered into a settlement agreement requiring the Settling Plaintiffs to cease opposition activity related to the specific

26

disputes underlying the litigation.

Accordingly, the Court overrules the Plaintiff's objection and accepts the Magistrate

Judge's recommendation to grant the Defendants' motion to dismiss for failure to state a claim as

to Count II.

## VII. Conclusion

In conclusion, for the above stated reasons, the Court shall accept in part and reject in part

the Magistrate Judge's Report and Recommendation. The Court shall deny the Defendants'

motion to dismiss for lack of subject matter jurisdiction; grant the Defendants' motion to dismiss

for lack of standing as to Counts I and III; deny the Defendants' motion to dismiss for lack of

standing as to Count II; and grant the Defendants' motion to dismiss for failure to state a claim

upon which relief can be granted as to Count II. The Plaintiff's objections, with exception to

those relating to standing as to Count II, shall be overruled. An appropriate order this day shall

issue.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum

Opinion to all counsel of record and to Magistrate Judge Crigler.

ENTERED: _Norman K. Moon_
United States District Judge

_8/26/05_
Date

Case 3:04-cv-00081-NKM-JGW   Document 27   Filed 08/26/05   Page 27 of 27   Pageid#: 174